HICKS et al. v. SOUTHWESTERN SET-
TLEMENT & DEVELOPMENT COR-
PORATION et al.

No. 4449.

Court of Civil Appeals of Texas. Beaumont.

Sept. 16, 1948.

Rehearing Denied Oct. 27, 1948.

See also 181 S.W.2d 982, and 188 S.W. 2d 915.

A. M. Huffman and James F. Parker, both of Beaumont, and Grover C. Lowe, of Woodville, for appellants.

Blades, Chiles, Moore & Kennerly, of Houston, for appellees.

WALKER, Justice.

Appellants, referred to hereinafter as Plaintiffs, brought this action in Trespass to Try Title against Appellees, referred to hereinafter as Defendants, to recover the title to and the possession of the Adolpho Sterne League, Abstract No. 32, in Tyler County, and to recover substantial damages as well. Defendants disclaimed surface ownership of some 400 acres of the League, and on trial, Plaintiffs disclaimed the same interests which Defendants had disclaimed. At the close of Plaintiffs' proof, the trial court instructed a verdict in behalf of Defendants, and Plaintiffs have appealed.

Plaintiffs claim only a limitation title to the Sterne League, and the title claimed by them is founded upon the possession of a few acres of the League by one Thomas Collier, who died in January, 1900. Plaintiffs say that such actual possession as their proof shows Thomas Collier to have had was referable to a tax deed dated December 15, 1864, made to him by the District Collector of the Confederate War Tax. This deed, they say, purported to convey the Sterne League and they say further that Thomas Collier's actual possession, being referable to this deed, effected a disseizin of the entire League.

Plaintiffs claim the title of Thomas Collier under and by virtue of the statutes of descent and distribution.

█ Plaintiffs' proof did not fix either the location or the boundaries of Thomas Collier's actual possession with the certainty required to support a judgment for the land held in such possession, and under Plaintiffs' pleading, the trial court properly instructed a verdict in Defendants' behalf unless this proof exhibited a prima facie title to the entire League, vested in Thomas Collier. The arguments of the parties raise the following issues:

(1) The effect of the assignment for the benefit of Thomas Collier's creditors:—On September 9, 1890, Thomas Collier, who was a merchant, having places of business in the communities of Town Bluff and Spurger, in Tyler County, executed an assignment for the benefit of his creditors. R. K. Bower, who is identified by some of the proof as an employee of Mr. Collier's, was named as Assignee. This instrument was filed for record on the day it was made, and we will assume that the Assignee accepted his trust. We will also assume that the instrument was a valid statutory assignment for the benefit of those creditors of Mr. Collier's who would accept it, good against the criticisms made of it in Plaintiffs' brief, and that having accepted his trust the Assignee became vested with title to all of Thomas Collier's property, excepting only property exempt to him. Thomas Collier's claim to land upon the Sterne League was not exempt.

Whether the Assignee filed a bond or made a report to the District Court were matters not touched on in the evidence. The proof leaves it uncertain whether the Assignee acted under the assignment or not, but there is proof that Thomas Collier's actual possession of the acreage upon the Sterne League continued to exist for some time, perhaps 3 or 4 years, beyond the date of the assignment, and there is no evidence that the Assignee ever asserted a claim to, or exercised dominion over, or assumed to sell, any part of the Sterne League.

Defendants say that the assignment to Bower constitutes proof of an outstanding title to the Thomas Collier claim, vested in the Assignee.

█ This argument is overruled. Plaintiffs filed this action on February 25, 1942, over 50 years after the assignment was made, and whether the proof is to be construed as showing that the Assignee did or did not attempt to perform his trust,

we must presume from the information before us that the administration of the trust (short of a redelivery or formal reconveyance to the Assignor) has been wound up or has terminated in some manner in which the interested parties acquiesced. See: 5 C.J. 1195 (#283); 6 C. J.S., Assignments for Benefit of Creditors, § 164, p. 1322; 4 Bogert, Trusts & Trustees, § 999, Notes 98-1; 32 Tex.Jur. 704 (#38). To some extent the trust expressed in Mr. Collier's assignment for the benefit of his creditors was regulated by statute, but the actual administration of the trust was left in the Assignee's hands, and after so great a period of time as that elapsing between the making of this assignment and the filing of this action we see nothing in the governing statutes which is inconsistent with the presumption we have made. See Acts 1879, Ch. 53, Acts 1883, Ch. 56, Vernon's Ann. Civ.St. art. 261 et seq.

The presumption made by us leaves the Assignee (if alive) vested, perhaps, with the naked legal title to any land owned under Plaintiffs' claim, but it leaves Plaintiffs vested with the equitable title to their respective shares of said land; and this equitable title would support this action. See: (1) 5 Tex.Jur. 90 (Secs. 32 & 33); 5 C.J. 1305 (Sec. 520); 6 C. J.S., Assignments for Benefit of Creditors, § 397, p. 1428. (2) Stafford v. Stafford, 96 Tex. 106, 70 S.W. 75; Newman v. Dotson, 57 Tex. 117; Montgomery v. Trueheart, Tex.Civ.App., 146 S.W. 284. (3) Lanius v. Fletcher, 100 Tex. 550, at page 555, 101 S.W. 1076; Moore v. City of Waco, 85 Tex. 206, 20 S.W. 61. (4) 11 Tex.Jur. 500 (Sec. 57); 41 Tex.Jur. 472 (Sec. 17); Padgett v. Guilmartin, 106 Tex. 551, 172 S.W. 1101.

(2) Incidents of the tax deed to which Plaintiffs say the possession of Thomas Collier was referable: Recitations in this tax deed show that the deed was made in furtherance of the war efforts of the Confederacy, and for this reason, Defendants say, in effect, that the deed must be regarded as being nothing at all and that claim of the entire League under the instrument, based upon actual possession of only a part of the League, did not effect a disseizin of the entire League, that Thomas Collier was, in law, a trespasser without benefit of memorandum of title and his disseizin was limited to his actual possession.

Accepting Plaintiffs' construction of their proof, the actual possession of Thomas Collier antedated the Code of 1879, existing as early as 1868 or 1869 or 1870 and perhaps as late as 1893 or 1894. There is no proof respecting payment of taxes by Thomas Collier and consequently, if possession prior to the enactment of the Code is to be of any significance we assume that it must have complied with Sections 14 and 17 of the Act of February 5, 1841, P.D. Arts 4621 & 4624 and that possession since the enactment of the Code must have complied with Arts. 3194 and 3195, R.S. 1879. Of these statutes, Art. 3195, R.S. 1879, provided, as does Art. 5510, R.S. 1925, that possession under a "written memorandum of title, other than a deed," which was duly recorded, should be construed as extending to the boundaries specified in the instrument. Sections 14 & 17 of the Act of February 5, 1841, did not refer to possession under muniments of title, but possession and claim under "color of title" was given the same effect. Charle v. Saffold, 13 Tex. 94; Wofford v. McKenna, 23 Tex. 36, 76 Am.Dec. 53.

We have had some inclination to disagree with this argument of Defendants because of the particular statutes under which Plaintiffs claim. See: Davis v. Howe, Tex.Com.App., 213 S.W. 609, and decision cited therein; Houston Oil Co. v. Jones, 109 Tex. 89, 198 S.W. 290; Moses v. Dibrell, 2 Tex.Civ.App. 457, 21 S.W. 414; Sanders v. Word, 50 Tex.Civ. App. 294, 110 S.W. 205. Such violation of law as may have been involved in the transaction culminating in the tax deed would have terminated before Thomas Collier entered upon, or extended his possession upon, the Sterne League and began to claim the entire League under this deed; the tax sale and tax deed would, at most, have been only the occasion of the possession and claim. Thomas Collier's claim of title had he asserted the right Plaintiffs now assert, would have been founded

upon the statutes of the State of Texas and acts lawfully performed thereunder, not upon the laws of the Confederacy; the tax deed would have served no function except to give notice of what land and what estate in the land was claimed by Thomas Collier. The ten years statutes, since the adoption of the Code of 1879, have referred only to a memorandum of title; and if it be admitted that the tax deed, being void on its face, would not support claim under the five years statute or under Sec. 16 of the Act of February 5, 1841, P.D. Art. 4623, Vernon's Ann.Civ.St. art. 5509, it may be argued that the deed would be sufficient as a memorandum of title. However, there are expressions in Whitehead v. Foley, 28 Tex. 268, apparently used in reference to Sections 14 & 17 of the Act of Feb. 5, 1841, which indicate that the court did not take the same view of "color of title" which might now be taken of the "written memorandum" referred to in Art. 3195, R.S. 1879, and successor statutes, and we leave undetermined the questions raised by this argument of Defendants.

We agree, however, for a different reason that the proof respecting the tax deed does not support Plaintiffs' theory of a disseizin of the entire League, because the proof does not show that the tax deed purported to convey the Sterne League.

The record shows that the land in suit is the *Adolpho Sterne League, Abstract No. 32,* in Tyler County. Plaintiffs so described the land in their petition, and the land is so described in the trial court's judgment.

However, the tax deed does not purport to convey this land; instead, it purports to convey, with other tracts not involved in this action, the following land in Tyler County:

Adolpho Sterne League, Abstract No. 32, in that county.

■ The significant variance in the descriptions is in the abstract numbers of the two surveys. The abstract number listed in the tax deed presumably refers to the abstract of land titles prepared by the Land Commissioner under Section 14 of the Act of Feb. 11, 1850, P.D. Art. 5183, Vernon's Ann.Civ.St. art. 7194, and since that statute provided that this abstract should list "the grantee, the amount of the grant, the class to which each belongs, whether headright, bounty, donation or special grant, and the county in which situated," the abstract number written in the tax deed was a material element of the description of the land conveyed by the deed. This number, in effect, referred to the records of the Land Office, which contained a detailed description of the particular survey. In fact, if there are several surveys in a county bearing the same name, the abstract number may be the controlling element of a description.

Similar variances have been held material. There is no proof other than the tax deed itself to identify the land in suit with that purportedly conveyed by the tax deed, and the following decisions support our conclusion that Plaintiffs failed to prove "color of title" under the Act of 1841 to the land in suit or a "written memorandum" of title to said land under Art. 3195, R.S. 1879. Clark v. Kirby, Tex.Civ. App., 25 S.W. 1096; Willis v. Burke, 7 Tex.Civ.App. 239, 27 S.W. 217; Brokel v. McKechnie, 69 Tex. 32, 6 S.W. 623; Berrendo Stock Co. v. Kaiser, 66 Tex. 352, 1 S.W. 257; Williams v. Thomas, 18 Tex.Civ. App. 472, 44 S.W. 1073; Wolf v. Gibbons, Tex.Civ.App., 69 S.W. 238. Such proof, of course, was a necessaary element of their cause of action.

| No. on Abstract | Name of Original Grantee | No. of Acres | Description" |
|---|---|---|---|
| 36 | Adolphus Sterne | 4428 | |

This description apparently refers to the *Adolphus Sterne League, Abstract No. 36,* in Tyler County, and this league may, or it may not, be the same land as the

Defendants did not object to the admission of the tax deed on this ground, and have not referred to the particular defect upon which we have acted; but we find

nothing in their brief to be construed as an admission that the tax deed actually described the land in suit and it therefore seems proper for us to refer to this particular failure of proof, in support of the trial court's judgment. Such action is within the terms of the motion for instructed verdict.

(3) Our conclusion about the description in the tax deed defeats Plaintiffs' claim of limitation title, but if it be assumed that this deed did describe the land in suit, then it must be said that the proof concerning limitation title fails in another respect. Defendants argue that the proof fails to show that Thomas Collier claimed the entire League, and we sustain this contention. There was evidence of the following matters:

The League was granted to Adolfo Sterne on October 21, 1835, by the State of Coahuila & Texas and the title describes it as bordering the western bank of the Neches river. That river constitutes the eastern boundary of the League. The northern boundary of the League runs west from the river 8887 varas to a point marked by bearing trees. Thence the boundary runs south 2515 varas, and thence east to the river over a distance described in the transcription of the title as 12127 varas.

Thomas Collier's actual possession was fixed upon a small farm which Mrs. Berryhill referred to as "the old Tom Collier place." Mrs. Berryhill was a member of the Arline family, with whose occupancy about 1870, or a year or so before, Plaintiffs' proof of possession begins. This farm was apparently located upon the western bank of the Neches river at a point about half way between the northern and southern boundaries of the League. Our conclusion respecting the location of this farm is based upon the descriptions in the deeds from Reliance Lumber Company to J. B. Swearingen and Mrs. F. M. Hooks, proven by defendants; these instruments refer to Joe's Lake and to a "cut-off" which, inferably, are the same Joe's Lake and "cut-off" referred to by several of Plaintiffs' witnesses in discussing the Collier farm and the adjoining country. This "cut-off" was apparently an old bed of the Neches river in which overflow water ran. It left the western, or southern, bank of the river several miles north of the Sterne League, crossed several surveys and re-entered that bank of the river at the point we have indicated, on the eastern boundary of the League. Its course across the League was not plotted; but the description in the Reliance deed to Swearingen shows that its southern terminus left the river on a course approximately S. 51° 20′ West, traced, however, only 128 varas.

The testimony contains varying descriptions of the Collier farm. It consisted of at least one field south, or east, of the "cut-off" and perhaps of another field on the other side of the "cut-off." The proof does not fix the location of the field north, or west, of the "cut-off". The residence of the Arline family, the earliest occupants shown by the testimony, seems to have been located on the river bank near the mouth of the "cut-off" (on the southern side of the angle made by "cut-off" and river), and the field on that side of the "cut-off" seems not to have been far away. The field area on this farm was not definitely proven. The field south of the "cut-off" was once said to contain about 30 or 35 acres, and once as much as 50 acres. There was evidence from one witness that the field on the opposite side of the "cut-off," if this was a part of the Collier farm, covered about 75 acres.

Such improvements on this farm as the testimony shows were primitive, namely, log houses and log cribs, rail fences, etc.

Such possession as the proof shows Thomas Collier to have had of this farm was through tenants, and the evidence respecting the identity of these tenants and the periods of time they occupied the farm is indefinite in some respects and conflicting in other respects. The evidence does not show when Thomas Collier's possession began nor when it ended. Accepting Plaintiffs' construction of their proof, Plaintiffs showed that about 1870, or perhaps a year or so earlier, the Arline family were in possession of this farm as tenants of Mr. Collier. These were the earliest of Mr.

Collier's tenants identified in the proof; and J. B. Swearingen, or perhaps this man and Mrs. F. M. Hooks, occupying the farm in 1890 and after, were the latest of the tenants identified by Plaintiffs. There is evidence of possession by Mr. Collier as late as 1893 or 1894. There is some testimony that Bill Raymer was a tenant of Mr. Collier after the Arline family left the farm and there is evidence to the contrary. The conflicts and ambiguities to which we have referred need not be further discussed.

Thomas Collier was a merchant who resided near the village of Town Bluff, in Tyler County; and he operated stores at Town Bluff and at Spurger, another community in Tyler County. He seems at one time to have been a man of means, active in various sorts of business. He operated some farms; one witness refers to three farms. And at one time he was engaged, perhaps with others, in operating a sawmill. He was at least one who would understand and value his rights in property and would doubtless insist that those rights be respected by others. Mr. Collier died in January, 1900.

We hold upon the following grounds that Plaintiffs have failed to make out a prima facie case that Thomas Collier claimed the entire Sterne League:

(a) There is no evidence whatever that Thomas Collier claimed the entire Sterne League except the circumstantial inference to be drawn from the facts that he was in possession of a part of the League, that (on Plaintiffs' construction of their proof) there was of record a deed to him conveying the League, namely, the tax deed discussed above, and that no other source of title in him to land on the Sterne League was proved.

There is no proof whatever that Thomas Collier ever exercised any dominion over any part of the League other than the farm near the mouth of the "cut-off," or that he ever communicated to any one the fact that he claimed the entire League or any part of it other than the farm aforesaid; and there is no proof whatever that Thomas Collier, or any one claiming under him, ever paid taxes on any part of the Sterne League. Such circumstantial proof of claim as may be inferred from the possession and use made of the farm near the mouth of the "cut-off" is limited, at least in the absence of the tax deed, to the land included in that farm.

Such conduct is not to be expected from a man like Thomas Collier. A merchant operating two stores, a landowner operating three farms, one engaged in the operation of a sawmill, in short, a busy and for a time at least a successful business man, of varied interests, knowing the value of property, would normally have expressed his claim to a league of land in such a fashion as to make the existence and character of that claim apparent to one interested in the league. The Sterne League covered over 4000 acres of land, and was a valuable item. Yet Thomas Collier acted as if he had no interest in any part of it except the few acres under cultivation at the mouth of the "cut-off." He did not even list land on the Sterne League in the assignment he made for the benefit of his creditors, referred to above, although he did list in that instrument land on two other surveys.

(b) Such testimony of statements of claim by Thomas Collier as the record contains was expressed by Oscar Tucker, a witness who, if he is to be believed, would have known whether Thomas Collier claimed the entire League. Mr. Tucker testified that Thomas Collier claimed the farm, but he did not testify that Thomas Collier claimed any other part of the League. These circumstances raise the inference that Mr. Collier claimed nothing except the farm.

Oscar Tucker testified by deposition and also in person. He testified to the following matters:

He was a nephew of Thomas Collier. He was born in Mr. Collier's home on August 8, 1875, and lived there, with the other members of his family, until he left Tyler County in 1896, some 21 years after his birth. His recollection of the matters in controversy covers some 15 or 16 years.

During the time he lived in Thomas Collier's home, he worked for his uncle as if he had been Mr. Collier's own son. What-

ever Mr. Collier had to do, this witness helped him do it. That was just general farm work and cow work and helping log, or anything his uncle had to do. Mr. Collier did not pay him for his work. He lived there in Mr. Collier's home all that time. He became familiar with all the working and business that he helped Mr. Collier do.

"Q. Did that business have anything to do with any farm? A. Yes, sir.

"Q. What farm did you help him look after? A. Well, we had a farm up on Willow Creek and we had a farm at the cut-off and we had a farm there at home."

He helped Mr. Collier look after all these farms. "I went with him all the time."

"Q. If you have stated that Thomas Collier had a farm or farms—state whether —he worked them personally or whether they were worked by renters or tenants? A. By tenants and himself."

He did not have anything to do with putting people on the farms to attend the farms. "I would just go with him and he would do it.

"Q. Do you know of your own knowledge of Mr. Collier placing anybody on the farm at the cut-off or having anybody cultivate the fields for him? A. Yes, sir.

"Q. Who did he have cultivate the fields for him at the cut-off? A. Well, the first time it was the Arlines and the next time it was Uncle Bill Raymer."

He finally referred to Hooks and Mayo, or Swearingen, as tenants of this farm, although his testimony here is conflicting.

He knew where Joe's Lake and the "cut-off" were and said that he had been at the "cut-off" many times. He said that the farm at the "cut-off" covered about 30 acres.

He described this farm at the "cut-off."

"Q. The farms that you helped look after at the cut-off—where were they located with reference to the cut-off? A. Well, one was on one side of the cut-off and one was on the other—two fields."

One field was between Joe's Lake and the "cut-off" and the other field was on the eastern (or southern) side of the cut-off. He said that the Arline farm was on both sides of the "cut-off."

He said that he was familiar with the farm at the "cut-off" as long as he lived with his uncle—and as stated, he left his uncle's home in 1896. He said that he had stayed on this farm several nights and several days at a time.

"Q. —state what you did there and your reason for staying on it. A. Just to be with him (presumably, his uncle) and doing nothing."

He was first at this farm when about 5 years old. He referred to many other trips to the farm, for various purposes, made with Mr. Collier, with his father, or with one Frank Rigsby, an employee of Mr. Collier's.

He said that Thomas Collier had charge of this farm at the "cut-off," but had it rented out.

"Q. If you have stated that Thomas Collier had charge of this farm and was operating it during the time you knew it— state whether it was operated by him in person, or by tenants? A. Tenants.

"Q. State whether there was anyone living in the house on the farm during the time you were familiar with it. A. Yes.

"Q. Please state what years you knew this farm to be cultivated continuously under the direction of Thomas Collier. A. From the time I was five until I was twenty two years of age.

"Q. If you remember, state who actually cultivated the land, beginning with your earliest recollection of it, and continuing down to the latest date you remember of such cultivation. A. The Arlines were first, the Raymers in later years.

"Q. Please state whether or not the farm was cultivated continuously each year during that time. A. Yes.

"Q. Isn't it true that you cannot state as a fact now that the farm you have been asked about was cultivated each year over any period of years commencing 60 or 70 years ago? A. I can state as a fact that

the farm was cultivated as far back as I can remember."

He identified the members of the Arline family and told about how long they had lived on the farm.

"Q: Mr. Tucker, what was the general understanding in the community at that time as to whose land this was at the cut-off? (Objection sustained and question not answered.)

"Q. Do you know who claimed *this land* at that time? (that is, the land at the cut-off) A. Yes, sir.

"Q. Who claimed it? A. Tom Collier."

This is the only direct testimony in the record regarding Tom Collier's expression of a claim of title. It follows testimony describing witness' first visit to the farm, when he was about five years old, and referring to the Arline family, and from the antecedent testimony and the terms of the questions asked we construe the testimony quoted as referring only to the farm in the possession of the Arline family and to the time of this visit. Witness testified further that the Arlines did not claim this land as their own.

"Q. Mr. Tucker, do you know whether the Arlines were on this land when you first went down there with any one's permission or not? * * *

"Q. Do you know, of your own knowledge? A. Yes, sir.

"Q. Whose permission were they there with? A. Uncle Tom Collier."

Referring to Raymer, he testified:

"Q. Was Mr. Raymer cultivating that field with the permission of anyone? A. Yes, sir.

"Q. Whose permission? A. Tom Collier."

He gave a detailed description of his first trip to the farm at the "cut-off" and testified to making many trips to the farm to get corn which, from the various circumstances related concerning it and from the testimony related above, must have been paid by the occupants to Thomas Collier as rent for the land.

"Q. Did you go down there and get corn from Mr. Arline more than one time? A. Several times.

"Q. Over what period of time? A. Well, I would say in four or five years—six maybe.

"Q. Did Mr. Thomas Collier pay for the corn that you brought home, or not? A. Well, I know he didn't pay for it.

"Q. What did Mr. Thomas Collier have to say, if anything, about the corn? A. Well, just said he was going after his corn. We would load up and go get it. That is about all there would be to it. I was just a kid, five or six years old, and go with him and then later, why I went with him later after that corn. I went with Frank Rigsby after the corn and I went with my father after the corn."

He said that Frank Rigsby worked for Thomas Collier. Witness was about 17 or 18 years old when he last went after corn —which would have been in 1892 or 1893.

He testified that "we" got corn from Bill Raymer at the "cut-off." He testified in some detail concerning Raymer's occupancy, and we have already referred to his statement that Mr. Raymer was cultivating the field with Thomas Collier's permission.

He testified concerning an occupancy by Hooks & Mayo, and then by Swearingen. His testimony here seems contradictory in some respects.

This statement shows the intimate degree of Oscar Tucker's acquaintance with Thomas Collier, with Thomas Collier's business, and with Thomas Collier's relation to the farm at the "cut-off." It shows that Oscar Tucker was related to Thomas Collier, that he lived in Mr. Collier's home, worked with Mr. Collier, was acquainted with such details of Mr. Collier's business as he participated in and that he accompanied Mr. Collier frequently, that he was intimately acquainted with the location, aspect and use made of the farm at the "cut-off," and with the persons who occupied it from time to time from the date of his first entry upon that farm when he was about five years old (about 1880) until he left Tyler County in 1896, that he knew how these people came to be there and what their relation was to

the land and to Thomas Collier, that he was familiar with such dominion as Thomas Collier exercised over this farm, and knew that Mr. Collier claimed to own the farm.

■ Yet Mr. Tucker's testimony is limited to the small farm at the "cut-off." He only testified that Thomas Collier claimed *this farm*, this ·specific part of the Sterne League, and he never once extended Mr. Collier's dominion beyond the limits of that farm. It must be believed that if Thomas Collier had claimed any land upon the League beyond the boundaries of the farm at the "cut-off," Oscar Tucker would have known of that claim. Why, then, did he not testify to such a claim, in one way or another? His failure to show the existence of such a claim is a most convincing circumstance tending to prove that Thomas Collier's claim was limited to the farm to which his dominion was confined. See: 17 Tex.Jur. 302(·#86).

(c) There is another circumstance which, when considered with those set out above, tends to rebut Plaintiffs' theory that Thomas Collier claimed the Sterne League. Persons who knew Thomas Collier and who probably knew the claim of title he asserted recognized Mr. Collier's claim to the farm at the "cut-off," or at least to that part of it east (or south) of the "cut-off," while at the same time undertaking to acquire land elsewhere upon the league from other persons. Yet Mr. Collier never came into conflict with these persons, although they were known and accessible to him and from circumstances related, he must either have discovered their action or else have abandoned the farm at the "cut-off"—after what Plaintiffs say was an occupancy, under claim of title extending over many years. The relevant evidence is as follows:

By deeds dated September 18, 1890, the Reliance Lumber Company conveyed adjoining tracts of land to J. B. Swearingen and to Mrs. F. M. Hooks, the deed to Swearingen conveying 99 acres and that to Mrs. Hooks conveying 150 acres. The Swearingen tract was the easternmost. It bordered the western bank of the river; its southern boundary left the river bank at the mouth of the "cut-off," running along

the western (or northern) bank of the "cut-off" for 128 varas on a course of S. 51° 20′ W., and thence ran due west 900 varas to its southwest corner. Thence it ran north to Joe's Lake, a distance of 828 varas. Mrs. Hooks' tract adjoined this on the west; the south*east* corner of Mrs. Hooks' tract was 186 varas north of Swearingen's south*west* corner. What space lay between the southern boundaries of these tracts and the western (or northern) bank of the "cut-off" cannot be determined because the course of the "cut-off" below the southeast corner of Swearingen's tract was not proved. It might, or might not, have been sufficient to contain the Swearingen-Hooks field on the north side of the "cut-off," referred to in the trial court by Tom M. Sheffield, apparently as being rented from Thomas Collier.

The evidence (Plaintiffs') raises the issue that J. B. Swearingen and Mrs. F. M. Hooks cultivated the Collier farm at the "cut-off" as the tenants of Mr. Collier.

Charlie Swearingen gave testimony tending to prove: (1) that the said J. B. Swearingen, his brother, cultivated only a field south, or east of the "cut-off," which he refers to as the Arline field, before the purchases from Reliance; (2) that after the Reliance purchases, J. B. Swearingen and Mrs. F. M. Hooks cleared farms on the lands bought from Reliance, which, with the fact just stated, shows that the lands bought from Reliance had not previously been in cultivation by any other person and were thus not parts of the Collier farm; (3) and that J. B. Swearingen, or himself and Mrs. Hooks, cultivated the Arline field south, or east, of the "cut-off" subsequent to the date of the Reliance purchases but eventually abandoned it.

No conflict between Mr. Collier and these tenants of his is referred to, and it is apparent that Mr. Collier would have learned of his tenant's conduct, unless he had abandoned his farm.

Charlie Swearingen's testimony is referred to in more detail, as follows:

J. B. Swearingen was a son-in-law of Mrs. Hooks. The witness Charlie Swearingen testified that he was J. B. Swearingen's brother, and it appears from his tes·

timony that the witness was born in 1877 or 1878 and was thus 12 or 13 years old at the time of the Reliance purchases. His family had settled near Spurger, only a few miles from the "cut-off" when he was a baby. He had moved away from Tyler County during the 1st World War, settling in Silsbee, and his brother J. B. Swearingen had died while the witness was residing in Silsbee.

Charlie Swearingen was well acquainted with the Collier farm and with the country in which it lay, and with the use made of this farm by his brother. He testified:

"Q. Did your brother ever have any interest or business of any kind in there? A. In that swamp down there?

"Q. Yes, sir. A. Yes, sir.

"Q. What did he do there? A. He farmed there. He farmed land there a long time and eventually bought the land—some of it. * * *

"Q. Where was that farm with reference to the cut-off? A. Which farm are you talking about?

"Q. The one your brother cultivated. A. Across the cut-off is where I recollect the best. On the south side—

"Q. Did you ever help him with the farm? A. Yes, sir.

"Q. Farm work there? A. I recollect dropping corn in a little field over in there when he was in a tight of work.

"Q. Yes? A. That was south of the cut-off."

He testified further:

"Q. Can you give us an idea of about how old you were when they stopped cultivating the field on the south and east side of the cut-off? If you know. A. I don't know. It could have been something like 16 or 18 years, along in there, I think. (This would have been around 1893 or 1894, several years after the Reliance purchases.)

"Q. That you knew that farm to be cultivated? A. Yes, sir, that is—

"Q. Yes. A. From the time they got it they cultivated that land and then they got some land on this side (he refers to the western, or northern, side of the 'cut-off') and I think that is—that is along about the time they let that down (which would have been after the year of 1890).

"Q. Yes. What did they do then with the land east of the cut-off? A. It, eventually the fence went down and they never put it back, and I don't know what date that was either. I don't know whether they put that fence back. I left there then (he is referring to some departure other than his change of residence from Tyler County) and I don't know much about that. That is about as close as I can give you on that."

He testified on cross-examination:

"Q. Well, now, when you first started going in there, did your brother already have a farm cleared up and in cultivation? A. He cleared some land after that.

"Q. You say they bought some land and cleared it? A. They bought some land over there and cleared up land on the north side of the cut-off.

"Q. Well, did he have anything cleared up and in cultivation before he bought some land? A. He was cultivating that old field there.

"Q. Which old field, Mr. Swearingen? A. Across the south—

"Q. South? A. That is what he cultivated.

"Q. Well, now, let's talk about the old field that is sometimes called the Arline field. A. That is what I am talking about.

"Q. That is where he was cultivating when you first went down in there? A. Yes sir.

"Q. He wasn't cultivating anything there across the cut-off, where he later bought? A. He never cultivated any of that. The land I am talking about is south.

"Q. You know where the place is your brother later bought, don't you? The 99 acres? A. Later bought?

"Q. The 99 acre tract he bought from the Reliance Lumber Company? A. Well, he was interested in some land over there, on this side.

"Q. You know where that tract is she (referring to Mrs. Hooks) bought from the Reliance Lumber Company? A. Yes.

"Q. —don't you? A. Yes, that runs to Joe's Lake.

"Q. Yes. What I am inquiring about, when you first went in there, when you were about 7 years old, did your brother have any land ·cleared up on those two places? The 99 acres and the 150 acres? A. Not when we was talking about this here, across there (indicating)—I don't think he had any land on this side (indicating) then.

"Q. I see. A. They bought this land later in there.

"Q. They bought it later. A. Yes.

"Q. That's right. The deed's been introduced in evidence and shows that they bought that land in the year 1890. A. Yes.

"Q. Now, they didn't have that cleared up and in cultivation until they had bought it? A. Never that I knowed anything about. * * *

"Q. Well, you were in there when you were about 7 years old and you remember about the man by the name of Rigsby and Oscar Tucker coming down there and haul-ing· off corn? A. That's right.

"Q. You would remember if they had anything over there, wouldn't you, Mr. Swearingen? A. Over where?

"Q.· Over there where they bought in 1890? If they had had that cleared up in 1884 when you were 7 years old, you would have remembered about it, wouldn't you? A. I don't believe it was cleared up over on this side. (He referred to the western, or northern side where the Reliance pur-chases lay.) I don't think they did until they bought.

"Q. All right. Well, then, the place where your brother was cultivating was over across the cut-off from where he bought, wasn't it? A. That's right.

"Q. And that is the old place that the Arlines cultivated a year or two, wasn't it? A. Yes, sir."

Charlie Swearingen knew Thomas Collier, and had stayed at his home.

Charlie Swearingen testified to Frank Rigsby and Oscar Tucker hauling rent corn and rent products from the farm at the "cut-off"; this testimony seems to have been stricken insofar as it is tended to prove a payment of rent, but the following remains in the record. Mr. Swearingen testified:

"Q. Where all did they haul corn from, Mr. Swearingen? A. They would haul·it from that old farm I was telling you about, across the cut-off. * * *

"Q. You never did see them hauling any from that farm on the other side of the cut-off that your brother and Mrs. Hooks bought, did you? A. No, I don't think they did. If they did, I don't recollect.

"Q. You don't recollect ever seeing them hauling any corn from over there? A. No."

·Tom M. Sheffield's testimony, to which we now refer, tends to prove the following matters: (1)· That J. B. Swearingen and Mrs. F: M. Hooks occupied the Collier farm at the "cut-off" as tenants of Thomas Collier; (2) that the Collier farm contained two fields, one on either side of the "cut-off," a circumstance in disagreement with Charlie Swearingen's testimony, but this witness also referred to the field south, or east, of the "cut-off" as the Arline field; (3) that J. B. Swearingen and Mrs. Hooks cleared farms on the Reliance tracts after the purchase money was paid Reliance and not before, from which it may be inferred, as was from Charlie Swearingen's testimony, that these tracts or a substantial part of them had not been in cultivation before; (4) that their possession of the ·Collier farm south of the "cut-off" continued sub-sequent to their purchases from Reliance; (5) and that they eventually abandoned Mr. Collier's field but continued to cultivate their own lands for many years.

No conflict between Mr. Collier and his tenants is referred to. It is not clear to us that Mr. Sheffield meant to say that the large field. north of the "cut-off" (he says ·this field covered about 75 acres) was in the Collier farm. His testimony, viewed as a whole, leaves us under the impression that this field represented, at least in part, a new possession upon the land bought from Reliance, beyond the limits of the Collier lease.

Mr. Sheffield had perhaps the best oppor-tunity of any witness of ascertaining the facts respecting the location of the respec-tive field, dates of clearing, use made of the

Collier farm and the period Swearingen and Hooks occupied it. His testimony follows, in more detail:

Tom M. Sheffield was born in 1866, and he was thus about 24 years old when he settled in Spurger in 1890. He was a brother of Mrs. F. M. Hooks, and the wife of J. B. Swearingen was his niece. He seems to have come to Spurger to work for his sister and J. B. Swearingen, and he was employed by them for two years. He seems then to have left this employment and gone to work for himself. He had continued to reside in Spurger since settling there. While he was employed by Mrs. Hooks and Swearingen a part of his work was done on the farm at the "cut-off", with which, and with the use made of this farm by his employers and their relation to the farm and to Thomas Collier he professed to be familiar.

He testified:

"Q. Where was the farm? A. Farm on the river, where the cut-off makes out of the river."

"Q. Now, this farm that you are talking about that Mrs. May Hooks and Mr. John Swearingen had down there, what survey is that on? A. That was on the Sterne."

"Q. What kind of a farm was this, Mr. Sheffield? A. Well, river bottom farm.

"Q. Where did it lay with reference to the cut-off?

"Q. I say, where was the farm with reference to the cut-off? A. Well, they had a farm on each side of the cut-off.

"Q. And do you know where a place was that was known as the Arline place? A. Yes.

"Q. Where was that? A. That was across the cut-off, on the east side of the cut-off.

"Q. Next to the river? A. Yes, right at the point of the river in the cut-off, just across the cut-off, their improvements on the bank of the river and the bank of the cut-off.

"Q. Was there some of the farm over on that side? A. Yes.

"Q. Were the Arlines still there? A. No.

"Q. Had they left? A. Swearingen and Hooks had it in charge.

"Q. Now, how much of the farm was on the south side of the cut-off? A. Oh, there must have been, I guess, about 30 or 35 acres. * * *

"Q. That is on the south side of the cut-off? A. Yes, on the south side. On the east side. * * * I would say on the south side of the river and the east side of the cut-off.

"Q. Was there some farm on the west side? A. Yes.

"Q. —of the cut-off? A. Yes.

"Q. How much of the farm was on the west side of the cut-off? A. I judge to be about 75 acres."

He had known Thomas Collier ever since he could remember.

He testified:

"Q. During the two years that you were down there on the farm did Mrs. Hooks and Mr. Johnny Swearingen pay rent to anybody? Or did they keep all they made themselves? A. No, they rented the farm, paid it out—crop.

"Q. What rent did they pay? A. A one third and a one fourth.

"Q. Who did they pay that to? A. Paid it to Uncle Tom Collier.

"Q. While they were there on that farm did you ever hear them say anything about who they were renting from? A. They said they rented from Uncle Tom Collier.

"Q. That was the first year you were there? A. That was the first year they bought it, you know.

"Q. Afterwards they bought some land there? A. They bought some land on this side of the cut-off—the latter part of the year I went there.

"Q. —Which side of the cut-off was the land they bought? A. On the west side.

"Q. What did they continue to do with the land on the east side? A. They cultivated it over there.

"Q. As their own or somebody else's tenants? A. They rented it.

"Q. From whom? A. Tom Collier, they told me."

Further:

"Q. Commencing with 1890, the 18th day of September (which was the date of the Reliance deeds) Johnny Swearingen didn't pay any rent to Tom Collier, did he? A. Yes, they paid rent a year to Tom Collier, I think.

"Q. You mean they did that year? A. Yes, I think so. They never bought that until the Fall, some time in the Fall. I know I went there the first of the year and I couldn't tell you even what month it was but I knew it was along late—they paid Tom Collier rent."

Further:

"Q. After the two years time was up what did you do after that? A. Well, I went to work for myself.

"Q. Do you know how long they continued to cultivate that land down there? A. Well, I really don't know. Cultivated it as long as—about as long as Johnny Swearingen lived.

"Q. Do you know how long he continued to work and live there on the south or east side of the cut-off? A. No, I don't remember.

"Q. Do you know whether or not he worked there any after you left there? A. Yes, they worked it after I left." (This would have been over a year subsequent to the date of the Reliance deeds, and if Swearingen and Hooks were tenants of Mr. Collier, paying him rent, in 1890, it must be assumed that this relationship continued.)

Further:

"Q. What can you say, Mr. Sheffield, about that land having been cultivated? Was it just cultivated a year now and then or was it cultivated every year? A. What land? That on this side (referring to the western, or northern, side) of the cut-off?

"Q. Yes. A. It was cultivated every year.

"Q. How about the land on the other side of the cut-off? A. Well, it was cultivated every year until they discontinued it. I don't know when that was. That is the Arline place, across the cut-off.

"Q. You couldn't give us any idea about when they discontinued it? A. No, I couldn't tell you."

Further, referring to the Arline place:

"I never saw Arline living in it and I never did see but one person living in it, Tom Martin, and he was living there when I went there (which was in 1890).

"Q. How long did Tom Martin live there? A. He lived there a year. Mrs. Clock on the Arline farm rented it from Mrs. Hooks—log house across the farm.

"Q. Anybody else ever live there after the Martins? A. Not that I know of.

"Q. Nobody else ever worked that land over there except Swearingen after that, did they? A. Not that I know of, except with Swearingen's consent, you know, Swearingen and Hooks—they had it leased there until they bought, after they bought land this side, they let that go down."

He professed to know a good deal about the Reliance purchases and said that he had assisted in surveying the two tracts, that Mrs. Hooks and Swearingen had not wanted to buy the land (why, he does not say), but bought it nevertheless and paid $6 an acre for it.

"Q. They did not buy that land from Tom Collier, did they? A. No, they bought it from the Reliance Lumber Company.

"Q. Yes. And on that 150 acres and the 99 acres Johnny Swearingen and Mrs. Hooks cleared up some farms, didn't they? A. Oh, yes.

"Q. And that is where they were farming, wasn't it? A. Yes, they cleared—they didn't clear any farms until the money—

"Q. Until they bought the land? A. Until they bought the land.

"Q. Yes. A. Cleared some—

"Q. Yes. A. Cleared some after they bought it.

"Q. When did they buy that land? A. Let's see—it must have been in the Fall of ninety. Must have been, the best of my recollection. * * *

"Q. And they bought that property from the Reliance Lumber Company, didn't they? A. Reliance Lumber Company."

According to his testimony, Mrs. Hooks advanced the money for Swearingen's purchase, taking a lien for security, and later

acquired the land from Swearingen, apparently for non-payment of the debt, and that still later, Swearingen repurchased from her. At any rate, the witness had rented it from Mrs. Hooks. "I rented it from Mrs. Hooks when she got it back from Swearingen."

There is testimony from other witnesses tending to prove that the Collier farm lay on both sides of the "cut-off," this confirming an element of Tom M. Sheffield's evidence.

Mrs. Julia Anne Sheffield, the only other witness whose testimony is relevant to the inquiry, was a daughter of Mrs. F. M. Hooks and a niece of the witness Tom M. Sheffield. She testified that she was born in 1871 and that her parents had settled in Spurger when she was about 8 or 10 years old. This would have been about 1879 or 1881. She was married when she was 15 years old, that is, in 1886, and upon marriage she left her parents' household, where she had previously resided. She and her husband remained in Spurger.

Mrs. Sheffield testified that prior to her marriage she had sometimes accompanied her father to a farm which he operated and which seems to have been near Joe's Lake and the "cut-off." We may assume that her testimony at least raised the issue that she referred to the same farm as did Charlie Swearingen and Tom M. Sheffield.

She testified that after her marriage she rarely went to this farm.

Her testimony is confusing and in some respects, conflicting. Her recollection was not clear; it was hesitant and uncertain and she was able to furnish little information concerning the issues between the parties. Much of what she had to say was contradicted by others whose opportunity of knowing the facts was better than her own.

The following is about all she had to say concerning the location of her father's farm:

"Q. Do you know where Joe's Lake is? A. Yes, sir.

"Q. Do you know where it is with reference to Spurger? A. I have been there many times, in the Joe Lake, and fished in it since I have been grown.

"Q. Yes. A. Let alone when I was a child.

"Q. Did your father ever live on that tract of land? (What tract?) A. Well, he didn't particularly live there, he went and come.

"Q. Did he cultivate— A. Yes, sir.

"Q. —land there? A. He cultivated that land.

"Q. Whereabouts did he cultivate it? A. Cultivated on this side of the road, you call it cut-off.

"Q. North side? A. Yes, sir, I guess it was the north side. There is nothing across the cut-off, that has been burned."

The following is the only testimony she gave which might have some bearing on whether Mrs. Hooks and Swearingen repudiated Thomas Collier's claim, or recognized it:

"Q. Then what happened to that farm after he died? If you know. A. Well, now, I couldn't really tell you.

"Q. What did your mother do. A. My mother and Johnny Swearingen bought it.

"Q. Do you know when they bought it? A. Well, in a way, well, I don't know, now, they bought it all right, but I couldn't tell you what year it was, nothing about it, because I didn't even think about it."

The only purchases proved were made in 1890, the year after her father's death, but she did not know how long it was after her father died before her mother and Swearingen made the purchase she referred to.

The weight to be assigned Mrs. Sheffield's testimony may be indicated by the following deficiencies in her recollection and conflicts with other proof: (1) She did not know whether her father had rented the land or not. (2) She professed to know almost nothing about the purchase by her mother and Swearingen. (3) She did not know who had cultivated the field, referred to in her quoted testimony, after her father's death. (4) Despite her acquaintance with Joe's Lake, she declined to say whether it was near or far from her father's farm. It appears from the testimony of

other witnesses and from the Reliance deeds not to have been over a few hundred yards distant from the mouth of the "cut-off" and must have been nearer the farm. (5) She declined to say whether her father's field was large or small. (6) She said that her father cultivated the land while the Arlines yet resided on the other side of the "cut-off." This is in conflict with the balance of the record, unless her father was cultivating land which was not a part of the Thomas Collier farm. She did not know whether the Arlines farmed or not, and did not know when they had moved away nor where they had gone. (7) She traced the "cut-off" into Bingham Lake, and no other witness did, although some of the witnesses testified that it entered Joe's Lake and other Lakes.

We are not certain that Mrs. Sheffield's testimony ought to be construed as showing that the land farmed by her father was included in the Reliance purchases, but if it raises that inference, we give it little weight, in comparison with that referred to above.

The uncertainties in the proof summarized, or stated above, leave unsettled the question, whether the Reliance purchases did or did not include some of the Thomas Collier farm which was leased to J. B. Swearingen and Mrs. F. M. Hooks. However, it is certain that the Reliance purchases did represent locations extending substantially beyond the limits of this lease, for Mrs. Hooks and J. B. Swearingen were said to have cleared farms on these tracts after their tenancy under Thomas Collier began. It is also reasonably certain that J. B. Swearingen and Mrs. Hooks continued for an indefinite time to cultivate Collier lands lying south of the "cut-off," beyond the limits of their own purchases, after they bought the land from Reliance and it must be inferred that this was a continuation of their tenancy under Mr. Collier. It further appears with reasonable certainty that Mr. Collier took no action against his tenants; none is referred to, and Mr. Collier must have learned of his tenants' conduct or have abandoned a tract of land which, on Plaintiffs' theory of the proof, he had had under cultivation by successive tenants for over twenty years before the dates of the Reliance deeds, and to which, according to Plaintiffs, he had asserted title during that time. Such an abandonment is possible, but not probable. The conclusion, then, is that J. B. Swearingen and Mrs. F. M. Hooks, never repudiated Thomas Collier's title, or claim of title, but acted consistently with it, and that this claim of title was primarily fixed upon the Arline farm south of the "cut-off" or upon that and land north of the "cut-off" upon the Sterne League which Swearingen and Mrs. Hooks did not assume to buy.

Such conduct, of course, is utterly inconsistent with Plaintiffs' theory that Mr. Collier claimed the Sterne League.

There is a circumstance in evidence which suggests an explanation for Mr. Collier's limitation of claim to the farm at the "cut-off." Mrs. Berryhill, who was a member of the Arline family, had a recollection of living upon the farm which went back to 1868 or 1869 or 1870, some four, five or six years after the Confederate tax deed was made. She, herself, was born during March, 1864, some nine months before the date of the tax deed. She testified that this farm was called "the old Tom Collier place" and she referred to it as such. If she knew it as the "old Tom Collier place" when she was a child, and she must have known it by that name in childhood for she seems not to have known it by any other name, the suggestion is raised that Thomas Collier had occupied this farm before the tax deed was made, claiming it under some title, limitation or otherwise, not proven and that upon the close of the Civil War he abandoned any claim he may have had in mind under the tax deed—assuming, of course, that the deed purported to convey the Adolpho Sterne League in suit, a fact which was not proved. This suggestion is consistent with the balance of the record. He died in January, 1900, only some 35 years after the date of the tax deed, and it was not shown when he was born nor where he had come from.

We have referred to the statutes on which depends Plaintiffs' claim of limitation title. Claim of right to the entire Sterne League was a necessary element of

330

Plaintiffs' proof under these statutes. Ivey v. Petty, 70 Tex. 178, 7 S.W. 798. Doubtless evidence showing occupancy of a part and a deed of record to the occupant, conveying the whole, makes a prima facie case of claim; but this is only proof by circumstances. If it be assumed that the tax deed did convey the Sterne League to Thomas Collier then the aforesaid circumstantial proof of claim to the league by Mr. Collier was so weakened by the other circumstances to which we have referred that, in our opinion, Plaintiffs failed to meet the burden of proof imposed upon them. We hold that, on the proof as a whole, it does not appear from the preponderance of the evidence that Thomas Collier claimed the Sterne League.

 Under Points 1 to 19, inclusive, Plaintiffs have assigned error to the action of the trial court in excluding, or striking, certain testimony of Oscar Tucker. All of these Points are overruled. We agree with the action of the trial court in most of the instances, and think that if that court erred, the error was harmless. The first 7 of these Points refer to the deposition of Oscar Tucker; Mr. Tucker took the stand near the close of the trial and Plaintiffs had the opportunity to question him in detail. The questions referred to in the other Points seem intended to prove that various occupants of the Collier farm were the tenants of Mr. Collier; there were other circumstances in evidence tending to prove that the Arlines, Bill Raymer, J. B. Swearingen and Mrs. F. M. Hooks, and perhaps others, occupied this farm as tenants of Mr. Collier.

The foregoing comments dispose of the arguments of the parties and require that the judgment of the trial court be affirmed. We accordingly affirm the judgment of the trial court.

COE, C. J., disqualified and not sitting.

On Motion for Rehearing.

WALKER, Justice.

Plaintiffs' motion for rehearing has been considered.

Our holding (in part II of our opinion) that the proof fails to show that the Con-

federate tax deed described and purported to convey the Sterne League is withdrawn. Plaintiffs' motion for rehearing has not been controverted and we are satisfied, from the discussion in part I of said motion, that no issue was made between the parties regarding the description in the Confederate tax deed, doubtless because the abstract numbers of the Sterne League have been changed, and the deed referred to the number current when the deed was made, as appears from Plaintiffs' motion.

Otherwise said motion is overruled and the judgment rendered by this court on original hearing will remain in force.

COE, C. J., disqualified and not sitting.